The first case this morning is 4100999 McCoy v. Kavuri for the appellant Lisa Corwin and for the appellate Karen Kendall. You may proceed. Good morning. My name is Lisa Corwin and I'm here on behalf of Pam McCoy asking this court to order a new trial in her case. I know the court's familiar with the facts. I'll be very brief. Pam was admitted as an inpatient in the psychiatric unit of St. Mary's Hospital in Decatur, Illinois. Under the care and treatment of the defendant in this case, Dr. Kavuri, she was admitted. Dr. Kavuri ordered a nicotine patch to be applied to her. He did this despite her not requesting it, despite there being no indication that she was going through nicotine withdrawal, and with no knowledge whatsoever of her current medical condition, including her blood pressure. The patch was applied the day after it was ordered, and shortly thereafter she suffered a massive stroke, which was severely debilitating. She had to have brain surgery. She's currently wheelchair bound and doesn't have much use, if any, of the left side of her body. There are essentially five errors which occurred during the trial court proceedings, which I'm asking this court to reverse and award a new trial based on any one or certainly the cumulative effect of those five errors. The first one involves the defendant's principal or main expert, Dr. Goldman. Dr. Kavuri was a psychiatrist. The reason I say their main expert is this is the psychiatrist that they called to say that what Dr. Kavuri had done met the standard of care. Dr. Goldman's deposition was initially taken in December of 2008. After his deposition, some additional depositions were taken in the case. He was provided with supplemental materials, and so a second deposition was taken based upon the fact that he had been provided with new materials. That deposition got terminated because he had a medical emergency that came up, and the parties agreed we would come back and actually finish the deposition later, and so that's why there were three depositions of Dr. Goldman. The second one was never completed. During the course of the subsequent depositions of Dr. Goldman, I asked him if he stood by all the opinions he had previously given, and he affirmatively stated that he had. When he showed up at trial, however, his testimony had changed dramatically, and a number of things that he testified to previously he no longer agreed with. These were important things involving very important facts of the case. For example, initially he testified that there was a three-step process that would be required before you would administer a patch. He said you had to, number one, inform the patient the patch was available, number two, ask the patient if they wanted it, and number three, ask if they had used the patch before and had side effects. This was his initial testimony, which was actually good for the plaintiff because the defendant had done none of these things. He abandoned that testimony at trial and completely switched his testimony. Also, significantly, during his testimony at deposition, he said it was the physician's responsibility to prescribe a patch, even if it was administered by a nurse, and that that was the responsibility of the physician to follow up, and it didn't matter if it was a nurse that did it or not, it was the doctor who prescribed its responsibility. Were you able to use his first three depositions to impeach him at trial? I did impeach him, yes. And at the time of trial, he said that, in fact, this testimony about the doctor's responsibility, he had completely changed. He talked to some of his colleagues and he decided, actually, it wasn't the responsibility of the physician at all, it was the nurse that was making all the decisions. The nurse, he compared the nicotine patch to Tylenol or milk of magnesia. And he also previously had tested, and of course, that again was bad testimony for the plaintiff because previously he said it was the physician's responsibility, and now he was flipping on that. And then he also flip-flopped on whether or not she was having any symptoms of withdrawal. Again, his initial testimony was good for the plaintiff, that he looked through the record and he couldn't see any instances where she was having any withdrawal, and he flipped his testimony on that. He consistently testified that standard of care was not violated, did he not? Yes, yes. But the bases for that opinion, he completely changed. In terms of his testimony was that there was... The trial court said you did a good job of cross-examining him. You stuck him on a number of points, but it was not a suppression by the defense of newly discovered opinions on Dr. Golden's part. The trial judge said, I think it was a matter of effective cross-examination and impeachment. I disagree with the trial court on that point, and... The trial court listened to hours of testimony. How do we sit here and say, oh, you were wrong on that? Because you were one of the justices that sat on the White v. Garlock case, and that was exactly the argument that the defense made in that case, that it was effective cross-examination that caused the witness to change their testimony. And this court said, in White v. Garlock, doesn't the plaintiff's attorney have the right to an expectation upon cross-examination that he is not going to hear a different answer from the expert than what's in the disclosure? And this court responded, we agree emphatically with the answer, an emphatic yes. And I think that that's still good law, and I think that we're in a position here that I was entitled, or my client was entitled to that, just as Rose White was. The court went on in White v. Garlock to say that there shouldn't be a trial by ambush, and that White had an absolute right to conduct her cross-examination with confidence that she knew all of his pertinent opinions. The fact that it was elicited during cross-examination... The trial court in White went your way, right? The trial court in White noted that the shift in opinion is significant, going to a critical issue in the case. It's the opposite here. The trial court in this case said that the witness disagreed with himself. I mean, the expert himself testified that he had made significant changes in his opinions. I understand that the trial court made comments on the testimony that make it difficult for the plaintiff. The court made its ruling, but I think that's why we have appellate courts, so that I can have the opportunity to explain to you and show you the actual testimony. It was significant and substantial changes. The trial court didn't acknowledge that. The trial court didn't acknowledge that, but I think if you look at the record, you will disagree with the trial court on that point. I mean, these were substantial changes that he made in his testimony. They were known to defense counsel beforehand, and they were not disclosed. This is the same factual scenario as we have in White v. Barlock. And they were known to defense counsel. Also, I want to point out to the court in the appendix of defendants at A5 and A6 is the questions in my offer of proof. I first asked the doctor in my offer of proof, setting aside your meeting last night and this morning, did you talk to them about this? And then he gives his answer where he says, I don't think you're absolutely correct that parts of what I've been saying are quite different than what I said in December, but you and I have had the opportunity to talk about these things and my views further. And then I said, now, in the meeting you had with counsel last night or the meeting you had this morning, in other words, just now focusing on those two meetings, did you go over the testimony with counsel that you were going to offer today? And his answer was, some of it, yes. And then I said, and did you discuss those opinions with counsel that you're talking about, the ones that are different than the ones from December of 2008, with counsel either last night or this morning? And his answer was, yes, as well as previous to that. So that part of the exchange was not in the defendant's brief. It is in our reply brief. He admitted that in the meeting last night and the meeting that morning, he had discussed with defense counsel the fact that his opinions were different. This was not disclosed to me. I think under White v. Garlock, the court's statements in that opinion strongly support an award of a new trial. In White, this court said, when a jury hears improper evidence, the trial court possesses the authority to award a new trial. And that's what should have been done. I think there was substantial changes. We were very prejudiced by those changes. The idea that it came out during my cross or that it was vigorous. So what would be different at a new trial? Well, in White v. Garlock, the trial court would not permit the expert to testify on those points and those areas where he had changed his testimony and counsel was aware of it. And so I would ask that a new trial be awarded and that Dr. Goldman be barred from offering those opinions. White stands for that authority? Yes. That on a new trial, if the expert has changed his mind, he's free from testimony. Correct. That's what the trial court, the restrictions, there was restrictions on Dr. Smith's testimony on retrial. I'm trying to figure out the rationale for that. I think it's because of the... If it's an honest change of opinion on retrial, why couldn't the expert testify to that and then you would cross-examine as you did in this case? I think because of the Rule 213 violation and that the court found that counsel knew of that violation in White. I think just as here there was testimony by the individual that they had told counsel that, and under 213i you have an obligation to inform your opponent when you know that the opinions have changed, and I think that they didn't do that so that the court felt that the sanction the trial court awarded was appropriate. And your major gripe with Dr. Goldman is he, at one point, said it's the doctor's responsibility to order the patch, and he later said the nurse had some discretion in providing the patch? Well, that's one of the things, and he went beyond saying the nurse had some discretion. He said that the nurse was making all the decisions. I think that's a direct quote from his testimony. Item number three on my list of errors, or I'm sorry, I think it's number four, is that the defense blamed the empty chair and blamed the nurses throughout the trial by claiming not just that they didn't tell Dr. Caburi the blood pressure, but that they had an obligation to do so and was critical of the nurses for doing that. And so I think Dr. Goldman's testimony confounded that error or compounded that error by giving the jury the impression that really the physician didn't have any responsibility. The nurses have some role in this, don't they? The doctor doesn't take the blood pressure, the nurse does. Isn't that right? Yes. I mean, I assume the nurses take the blood pressure. So what's wrong with one of the defense witnesses saying that? There is no problem with a defense witness that would say that the nurse takes the blood pressure. The problem is that the defense had a theme throughout the trial that it was the nurse's responsibility and that the nurse didn't meet that responsibility. And if you look at our reply brief, they talked about expectations of the nurses, that the doctor had a right to expect this. You complain about the defense counsel's opening argument. We do know that nurses were supposed to call with abnormal vitals. We also know there's no evidence they did. Right. What's wrong with that statement? Because they're saying that the nurses were supposed to do something that they didn't do. Isn't the defense counsel saying there were no abnormal vitals? Oh, no, there were abnormal vitals. She had high blood pressure on two separate occasions. Very high blood pressure. And they're saying that they were using that as a defense, saying that it wasn't the doctor's fault. It was the nurse's fault. And if they wanted to do that under Leonardi, they needed to have testimony to back that up, that it was the sole proximate cause, was the nurse's behavior, and they hadn't brought the nurses into the case. And this all, Dr. Goldman's testimony, I think, confounded that. This person was a heavy smoker, wasn't she? She was. Well, there was different testimony on that point. One to two packs was on one of the records, which I note the defendant cited. Actually, one of the records said she was a nonsmoker, so hospital records. When you go into the hospital, you can't smoke anymore. So isn't that a... Doesn't that have an impact on your system? Isn't that why they worry about withdrawal, and that's why nicotine patches are supplied? I think that in some people there is withdrawal issues. I think that you're correct, that that is why they offer the patch. But in this case, there was no testimony or evidence that she was experiencing withdrawal, which would necessitate a patch. And there was testimony and evidence that the patch isn't good for everybody. And there are some people that the patch shouldn't be applied to, and that includes people that have high blood pressure. And on the first day of her admission there, her blood pressure was something like 197 over... I mean, she had very high blood pressure, multiple high blood pressure readings. If the doctor would have known that, he would not have applied the patch. I mean, you don't give the patch to everybody. It's just like any other medication. Sometimes you have to take the person as an individual. Some people have other health problems that preclude a medication from being appropriate for them. Dr. Duncan said if the blood pressure was 200 over 100 or below, he would not hesitate to give the patch. That is what Dr. Duncan said. So according to all that, she did not have excessively high blood pressure readings. Well, Dr. Duncan said that she had high blood pressure. He actually put her on medication for high blood pressure. I actually don't think there was any dispute that she did have excessively high blood pressure and high blood pressure readings while she was in the hospital. Dr. Duncan met with the family after this occurred and told the family that he did not think it was appropriate for them to file a case. Dr. Duncan is very strongly opposed to medical negligence cases, has materials in his office on his walls and so forth, and discouraged the family from filing the case. He was called as a defense witness in the case for the doctor. And I think that the jury has the right to consider that testimony and the court should consider that testimony and the possible bias involved in that testimony given his profession, his spoken beliefs, which I was actually precluded by the trial court from bringing out the materials and things in his office and his personal beliefs about the impropriety of filing medical negligence cases. But Dr. Duncan did say that. You're right. He said if it was 200 over 100, he would give a patch. There was testimony that was inconsistent with that, however, too. Well, isn't defense counsel acting correctly or within the bounds when defense counsel says there were no abnormal vital signs reported? I don't think defense counsel believed that there were no abnormal vital signs. I think defense counsel's position was that they were never told of the abnormal vital signs. I think that's what is actually… Counsel, before you run out of time, I'd like to hear some arguments on a couple of your other issues. First of all, you assert there was a judicial admission. I do. What is our standard of review? I'm kind of confused about that. It seems like the question of whether something is a judicial admission is reviewed by no vote, but we're asking here to determine whether a directed verdict would have been appropriate, which would seem to be an abuse of discretion, so which is it? I think whether or not the testimony constituted a judicial admission is a de novo question for the court to consider. I think whether or not a directed verdict should have been entered also should be reviewed under that standard because the case that was cited by the defense, the Serrano case, involved something that was entirely different. That involved a request to admit, and there was ambiguity in the request to admit, and that was the case that they were relying upon for the idea that it was within the discretion of the trial court, and the trial court, and the answer to a request to admit. In this case, I have, and I wanted to point out for the court, I brought the transcript with me because there was some, again, statements by the trial court and counsel and defense in this case saying that there was smoke and mirrors and word games at page, well, first of all, what I did in opening statement was I had an easel, and I had on the easel the four allegations of negligence in the case, and then when I was questioning the doctor, I said to him at 160, now I referenced four things that I thought were things that you, and we would have expert testimony, that you would have done differently in this case, and you were here for opening, and you heard those things, right? Answer, yes, yes, and you understand the concept of being reasonably careful, right? Answer, that's right, and then I went through with him those four things. He disagreed with me that he wasn't reasonably careful on number one, but he agreed on number two and number three, and then number four he disagreed. So if you look at the testimony and you read through it, there was no, you know, starting at page 166 of the transcript, you can see the questions, you can see the answers. Dr. Kivori has been practicing medicine in the United States for 30 years. There was never any indication that he was confused. There was never an objection by the defense saying he doesn't understand, the court never intervened and said I think we're having an issue here. There was answers, questions, and clear answers. You're out of time, counsel, you'll have to vote. Thank you. Ms. Kendall. Good morning. If it pleases court and counsel, my name is Karen Kendall. Today before this court I represent Dr. Kivori, who was taking care of the plaintiff during her intensive care psychiatric hospitalization. In this case and at trial, the plaintiff sought to blame Dr. Kivori for the fact that she suffered a stroke. Dr. Kivori's defense and his theory of the case was number one, the nicotine patch was proper. Number two, he did not do anything wrong in treating the plaintiff. And number three, the nicotine patch did not cause the stroke that she suffered. The plaintiff is not before this court contending that the verdict of the jury was against the manifest weight of the evidence. Indeed, the trial court in reviewing the post-trial motion stated just that. The verdict of the jury was supported by the weight of the evidence. The only claim before this court today is that the trial court abused its discretion. I submit to this court that on each of the five issues which the plaintiff raised, the trial judge was extremely thoughtful and detailed in ruling and did not abuse his discretion, but rather ruled consistent with the existing law. The first issue which the plaintiff sought to talk about today was the testimony of Dr. Goldman. And like the plaintiff, we invite this court to read the full testimony of Dr. Goldman as well. Because as the plaintiff's counsel kept pushing him on cross-examination and impeaching him, Dr. Goldman often responded, okay, you're right, but that's not relevant. That's not what I'm here to talk about. And he tried to distinguish between specific questions pertaining to this patient and generalities. But let's get to the heart of this issue. Because what the plaintiff is saying here is not that Dr. Goldman changed his testimony in some non-material aspects. The plaintiff is really attacking defense counsel and saying defense counsel knew that Dr. Goldman would have these changes in testimony and deliberately withheld it. That's what the plaintiff is contending. And that is absolutely untrue. You can see that as you review the testimony and you can see that never at any point did the trial judge even have the slightest concern that anything that Dr. Goldman said at trial was something if it was a surprise to plaintiff's counsel, it was a surprise to defense counsel as well. But it's more important to recognize that this really, this case isn't like White v. Garlock at all. In White v. Garlock you had an expert who was deposed who said, I have no opinion as to whether the plaintiff is suffering from asbestosis. The expert came to trial and said, guess what? I have an opinion now. He's not suffering from asbestosis. That goes to the heart of the case. A material factor in it and did of course damage the plaintiff and moreover the trial judge recognized that. How would you respond to counsel's argument that the expert discussed the testimony with defense counsel and was advised, defense counsel was advised of the opinion which changed prior to the testimony? I don't think that is specific enough to really have, you know, I mean, Dr. Goldman, first of all, was trying to be honest. He was also trying to engage intellectually with plaintiff's counsel as she sought to impeach him and explore this and he got intellectually engaged. So when he says that, what he's talking about in his opinions, and he's talking about his opinion that Dr. Kaveri did nothing wrong and that the patch was a big surprise that the nurses have some role in administering the patch, Dr. Kaveri himself testified to that. This isn't any surprise. This isn't anything new that Dr. Goldman made up. Dr. Kaveri had already said that. Of course, you know, this is just common sense. This is basic hospital procedure. There are, there's a checklist, there's standard protocol for an intensive care psychiatric ward. One of the goals, of course, is to make sure that anxiety which is present in those patients doesn't get too overwhelming or too out of hand. Of course, it already is or they wouldn't have checked into the intensive care unit in the first place. But at any rate, so Dr. Kaveri explains what the unit procedure is. Dr. Goldman didn't say anything different. This, in my mind, is a false issue. This court could not find on this record that defense counsel intentionally withheld material opinions. We would ask this court to rule that the trial judge did not abuse his discretion in finding this. Isn't the blood pressure of 197 over whatever it was, isn't that pretty high blood pressure? Sure it is. You're asking the ostrich who sticks my head in the sand about whatever, let's see. Shouldn't Dr. Kaveri have known that? You mean, shouldn't he have taken the blood pressure? Shouldn't he have known that it was 197 over 94? Well, first of all, your honor, let's get specific. She had normal blood pressure before this patch was administered. Number two, all of the witnesses who testified, Dr. Duncan, Dr. Goldberg, Dr. Nyquist, Dr. Ratan, all said that giving a blood pressure or giving a tobacco, whatever it is, substitute patch under these circumstances was proper. So you don't want to answer my question. Shouldn't Dr. Kaveri have known that at one point she had high blood pressure? According to unit protocol, the nurses should have reported high blood pressure, period. So it was the nurses' fault? No, it's a false issue. What the nurses did has nothing to do with Dr. Kaveri's theory of the defense, which was consistent with all the expert testimony, which was that the giving of the nicotine patch was proper, period. It was proper. So we just have to accept the general statement, it was proper, and we cannot ask about specifics like should he have known the blood pressure was 197 over 94? We can't even think about that. You can think about it if you want to, but if you're thinking about that, you might want to think about the fact that she had normal blood pressure at the time the patch was administered. I don't remember numbers, but the evidence is uncontradicted that she had normal blood pressure at the time the patch was administered. Number two, her blood pressure went up and down in relation to her anxiety, as Dr. Duncan discussed. She was not on any medication for blood pressure because he found that she would return to normal blood pressure without medication at the time of this hospitalization. Number three, a stroke is not caused by a nicotine patch. Nobody said that except plaintiff's expert, and plaintiff's healthy logic of saying, well, this happened at point A, and this happened at point B. Pardon? Are strokes caused by high blood pressure? Over time, over years, they can be caused by high blood pressure. Do nicotine patches cause high blood pressure? The testimony was that in individuals who do not routinely smoke, they can cause high blood pressure, but there's no evidence that this patch even caused high blood pressure in her. She had anxiety. She had a number of things going on. Some of the testimony was that the effects of a patch don't occur that fast. And secondly, there is no inciting event for a stroke. A stroke occurs after years of damage to the body, not in a second or an hour or in two hours. This case was tried on a false theory. That's what's wrong with this case. It took the jury just a couple hours to reach a verdict in favor of Dr. Kovari. The reason was they heard all of the evidence and considered it. And all of the evidence, the manifest weight of the evidence, supported the conclusion that this patch had nothing to do with the plaintiff's unfortunate stroke. And Dr. Laven's plaintiff's expert was the only one to contend that it did. And this is faulty logic to say that just because two things occur in temporal proximity does not establish a causal relationship. And all the other doctors who testified said that there is no causal relationship and that it was entirely proper to apply a nicotine patch under these facts. Counsel, I'd like to hear your argument on why the trial court didn't use its discretion in not allowing the rebuttal witness. Well, the rebuttal witness, Dr. O'Donnell, was deposed by plaintiff's counsel in December 2008. Not until May 2008 did plaintiff's counsel even decide to move to bar his testimony. Well, it's based strictly on timing, isn't it? The trial judge's ruling was on timing. We opposed it not only on timing but on the fact that Dr. O'Donnell, even though he's described as a doctor, was in fact not a medical physician. His training was a Ph.D. pharmacologist. And so we contended, although the trial court did not rule on this point, that he was not qualified to issue the same types of opinions or refute Dr. Rattan's analysis and opinions. If the rebuttal witness had been allowed, would that have caused a delay of the trial? Or is that clear from the record? It's not clear to me. But what is clear to me is the trial court repeatedly found that there was no good cause shown. And I think the trial court honestly wanted to find good cause to give the plaintiff an exclosure. But the trial court said, look, we've extended the deadline several times. You were just standing around waiting to see whether we were going to bar Dr. Rattan. We didn't do that. But you can't handle your trial preparation in that way. Why did the trial court refuse the jury instruction regarding insurance? I wasn't clear at all. I wasn't even clear what the issue was from reading the plaintiff's brief. They had two positions. One of them was, well, this has to be given in every case. Well, I'm honestly not aware of any IPI that there's no discretion given to the trial court. So I don't think that's the case. Secondly, they said, well, there's some instances in this record that justify it. Well, to be honest with you, this was a long record, a big trial, and I don't know where these mystery places are. They didn't list them in the discussion of the issue. I think they waived that issue. Moreover, that type of question would only go to damages. It certainly wouldn't go to liability. And so it seems to me pretty much of a non-issue. Well, I guess the question I have in my mind is I can't figure out why the trial court would have denied that instruction. The plaintiff asked for it, and there's no harm in giving it, and the jury's not supposed to consider the insurance issue anyway. I don't quite follow why the trial court denied the request. Was it even objected to? I assume it was objected to. You know, this instruction I think is probably headed for trouble waters. At that very moment, indeed. We just filed a motion to cite additional authority because the first volley at this instruction has occurred in a judicial opinion. I think it's headed for trouble waters. I think it troubles a number of people that it's this combination of two things that seems to suggest some things that probably aren't really the case. I don't think we could find that the trial judge abused his discretion in refusing to give it. If there are no other questions... I think I have one more. I asked the opposing counsel about the standard of review regarding the judicial admission and how that's kind of combined with the motion for a directed verdict. What do you believe the standard of review for this court is? Well, I believe the standard of review is abuse of discretion because that's really what they're saying is. They're saying that they got this testimony out of Dr. Kavouri that they're able to contend, I think, facelessly, but contend is a judicial admission. And so they're saying, okay, we got this, we pushed him here and whether he understood what we were saying or not or understood what he was saying or not, this bars everything else. I mean, this is the trump card. The standard of review for trump cards is abuse of discretion, directed verdict, and that's not... I can't imagine the court could say, the trial judge said, look, we listened to Dr. Kavouri testify, we heard him say I did not do anything wrong. Just because he didn't really get what was going on doesn't mean that he made a deliberate, intentional admission that he did something wrong in treating the plaintiff. Okay, thank you, counsel. Thank you. We ask this court to affirm the judgment of the trial. Rebuttal, please. Starting off where counsel left off, maybe just very quickly, there was two instances during the trial, defense counsel asked my client, who is disabled and has to have people come in to help her care for her daily needs, she asked my client, do I understand correctly that you personally don't pay those people, do you? That's what she asked my client, that you don't pay for the services that you're getting, which is one of the elements of damage that we were asking to be returned. Well, the objection was sustained. The objection was sustained, but the issue was before the jury that she doesn't pay these people. Then it came up again when Dr. Duncan, their witness, testified that, talked about Pam's insurance, that she wasn't any longer his patient because there was a change in her insurance. Then there was a third reference by their retained expert, Dr. Nyquist, that referred to my patient as someone who was obviously living in poverty. So there were three different examples that came up during the trial. I think if you look at the notes on use for 3.03, insurance is not to be considered, it was before the jury. On three separate instances, her wealth or poverty, her insurance lack thereof, the fact that she wasn't paying for the service that was brought up, and who knows if the jury didn't decide for the plaintiff but say, we find there's no damages because we know that she didn't pay for any of these things herself. We don't know how that testimony affected the outcome of the jury, but we do know they weren't instructed that they can't consider it. I think that that is one of the errors that merits a new trial. Counsel said the jury heard all of the evidence. The jury did not hear all of the evidence. I had a rebuttal expert, Dr. O'Donnell, his deposition was not ever taken, but he was a pharmacologist and under Home v. Zia, which is a Fourth District case, again, I think you were on that panel, Justice Cook, and that case, this court held and was affirmed by the Supreme Court that a party has a right to call a rebuttal witness if something new and their case in chief. Their pharmacologist testified that based on studies in the medical and scientific literature that there's no increase in blood pressure when you apply a nicotine patch. That testimony came out earlier. No, it didn't. The problem was that you didn't like, let's see, the pharmacologist was refusing to answer your question about who he worked for and how much he got paid. Correct. But you knew what he was going to say. No, actually what happened was I took his deposition in December, and then in January I was involved in a jury trial. In February I filed a motion with the court to bar him as a witness because he refused to answer my questions. In March, the following month, I called the court and asked for a hearing date on my motion. The court said the earliest date we can give you is May 4th. At the hearing on May 4th, the trial court said, I will bar him if he doesn't answer these written questions. Defense counsel said, he's already refused to answer these at his deposition. I don't know if he's going to answer them in the written form either. And I said, if he isn't barred and if he does answer these, I would like to disclose a rebuttal expert. We waited. I propounded the interrogatories. He did not timely answer. I sent a letter to the defense counsel. You knew what he was going to say though. You didn't know whether he'd be allowed to testify. Correct. He'd taken his deposition. He'd said all those things in his deposition. Yes, but I did not know whether or not he was going to be permitted to testify or whether or not they were going to call him as a witness. And under this court's authority in Home Visaia, once they did and they made that choice, I had the right to call someone to rebut the opinions and testimony that he offered. And I was refused that right. And the only basis on was timeliness. In Home Visaia, it was 60 days. In this case, it was more than 90. There was ample time to take his deposition. And actually, I disclosed his opinions and provided deposition dates to counsel in July. The trial was in November. It was set for September. It was set for September and continued to November. I renewed my motion after it was continued. But even if it would have been in September, I provided them with time. There was ample time. And under the authority of this court and the Supreme Court, I had a right to present that testimony. And I was barred from doing it. So, you know, they had a pharmacologist and I didn't. I did, but the jury never got to hear his testimony. He would refute each of those articles that the pharmacologist had cited. He should have been permitted to testify. Also, I want to comment. Counsel said that no one said that the stroke was not caused by an increase in her blood pressure. The defendant's own expert, Dr. Nyquist, said that the application of the patch could have caused the increase in blood pressure that, in his words, may have pushed her over the edge. So there was testimony that that was and could have been an inciting event, even by one of the defense experts. You're out of time, counsel. Thanks to both of you. The case is submitted and the court stands in recess.